Robert E. BRENNER, Steven J. Wickenhauser, Cristy K. Wickenhauser, Allan J. Seidling and Susan M. Seidling, Plaintiffs-Appellants,

v.

NEW RICHMOND REGIONAL AIRPORT COMMISSION and City of New Richmond, Defendants-Respondents-Petitioners.

Supreme Court

*No. 2010AP342. Oral argument February 7, 2012.* 
*—Decided July 17, 2012.*

2012 WI 98

(Also reported in 816 N.W.2d 291.)

For the defendants-respondents-petitioners, there were briefs filed by *Benjamin Southwick* and *Benjamin Southwick Law Office,* Richland Center, and *Ronald L. Siler* and *Van Dyk, O'Boyle, & Siler, S.C,* New Richmond, and oral argument by *Benjamin Southwick.*

For the plaintiffs-appellants, there was a brief filed by *Phillip R. Krass* and *Malkerson, Gunn, & Martin, LLP,* Minneapolis, and oral argument by *Phillip R. Krass.*

An amicus curiae brief was filed by *James S. Thiel* and *Corey F. Finkelmeyer,* assistant attorneys general, with whom on the brief was *J.B. Van Hollen,* on behalf of the State of Wisconsin.

¶ 1. DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals, reversing

an order of the St. Croix County Circuit Court, Howard W. Cameron, Jr., Judge. The circuit court dismissed the inverse condemnation claims of several landowners whose property is close or immediately adjacent to the New Richmond Regional Airport (Airport). The landowners alleged that an extension of the Airport's runway by 1500 feet amounted to the compensable taking of an easement because the resulting overflights had adverse effects on their properties, including diminished use and enjoyment and decrease of value.

¶ 2. The circuit court acknowledged that the subject properties had been adversely affected, but it concluded that "for a taking by the government to be compensable, the property owner must be deprived of all or practically all of the beneficial use of the property or of any part. The Court must consider the whole property and not just a portion of each . . . property." The court of appeals reversed, holding that the "standard for regulatory takings does not apply to physical occupation cases." *Brenner v. City of New Richmond,* No. 2010AP342, unpublished slip op., ¶ 1 (Wis. Ct. App. May 10, 2011).

¶ 3. We are presented with the following question: In airplane overflight cases, is the proper standard for determining a taking (1) whether the overflights are low enough and frequent enough to have a direct and immediate effect on the use and enjoyment of property, or (2) whether the overflights deprive the property owner of all or substantially all beneficial use of the property?

¶ 4. We conclude that a taking occurs in airplane overflight cases when government action results in aircraft flying over a landowner's property low enough and with sufficient frequency to have a direct and immediate effect on the use and enjoyment of the

property. We remand the case to the circuit court to make further factual findings and apply this standard to determine whether there were takings of the properties in this case.

## I. FACTUAL BACKGROUND
## AND PROCEDURAL HISTORY

¶ 5. The New Richmond Regional Airport is owned and operated by the City of New Richmond (City) in St. Croix County. The Airport is located on the north end of the city on approximately 350 acres of land.[1] The Airport is bounded on the west by County Trunk Highway CC (CTH CC).

¶ 6. In September 2006 the Airport began a construction project to extend its 4000 foot Northwest/ Southeast main runway by 1500 feet. The project was completed in June 2007. To make the extension possible, the City[2] acquired by direct condemnation approximately 62 acres of land from Steven and Cristy Wickenhauser (the Wickenhausers) whose 142.5 acres of land abutted the north end of the Airport. The City also

---

[1] The Airport is located approximately 30 miles northeast of St. Paul, Minnesota, so that it provides service to the Eastern Twin Cities Metro Area as well as to western Wisconsin.

[2] In this case, the Federal Aviation Administration (FAA), the Wisconsin Department of Transportation Bureau of Aeronautics (State), and the City worked together in acquiring the land for the Airport. The FAA and the State have a "block grant agreement" in which the State acts on behalf of the FAA as well as municipalities in acquiring land for municipal airports. For the sake of simplicity, we refer to the City acquiring property. These statements should be understood to represent the full relationship among government actors.

acquired a 3.813 acre avigation easement[3] over two parcels within the remaining 80 acres of the Wickenhauser property. The avigation easement covered airspace above the Wickenhausers' personal residence and dairy barn. The Wickenhausers asked the City to condemn their entire 142.5 acres. The City declined.

¶ 7. The Airport and the Wickenhauser property are on the east side of CTH CC. Robert Brenner (Brenner) and Allan and Susan Seidling (the Seidlings) own properties on the west side of CTH CC.

¶ 8. The Brenner property consists of approximately 5 acres and includes his personal residence, a barn, and other miscellaneous improvements. The house is 816 feet from the closest point of the extended runway. The edge of the Brenner property borders CTH CC and is closer to the runway than the house.

¶ 9. The Seidling property consists of approximately 15 acres including their personal residence, crop fields, and pasture land. It borders CTH CC on the east and is directly south and west of the Brenner property. The Brenner property was once part of the Seidlings' acreage. The Seidlings' home is approximately 1503 feet from the runway. Susan Seidling indicated that she runs a daycare business out of her home.

¶ 10. Some of the Seidling land and much of the remainder of the Wickenhauser land are rented for crops or other agricultural uses.

¶ 11. Like the Wickenhausers, both Brenner and the Seidlings asked the City to condemn their land after they learned of the planned airport extension. The City declined.

---

[3] An avigation or avigational easement is "An easement permitting unimpeded aircraft flights over the servient estate." *Black's Law Dictionary* 527 (7th ed. 1999).

¶ 12. The landowners and their witnesses testified in various proceedings about the adverse effects of the Airport expansion. In essence, the landowners complained that the extended runway led to noise, dust, dirt, flashing lights, disruption of their sleep, diminished enjoyment of their property, concerns about safety, direct overflights, and a decrease in property value.

¶ 13. As noted, the City condemned approximately 62 acres of the Wickenhausers' property and acquired an additional avigation easement. The State made a jurisdictional offer[4] for the land, the easement, and severance damages.[5] On December 14, 2007, the Wickenhausers notified the State that they were reject-

---

[4] *See Lamar Co. v. Country Side Rest.*, 2012 WI 46, ¶ 8 n.3, 340 Wis. 2d 335, 814 N.W.2d 159 ("Notice to the property owner of a jurisdictional offer is a jurisdictional requisite for the condemnor to proceed in condemnation. Wis. Stat. § 32.05(4). Pursuant to § 32.05(3), notice of a jurisdictional offer has eight necessary components, including, *inter alia,* a brief statement of the nature of the project for which the property is intended to be acquired, a description of the property and the interest therein sought to be taken, the proposed date of occupancy, and the amount of compensation offered.").

[5] The cover letter for the jurisdictional offer as well as an affidavit by the landowners' attorney refer to an avigation easement over the remaining acreage of the Wickenhauser property. However, the jurisdictional offer does not reflect an easement over the 77 remaining acres and the parties have not represented to us that any interest was acquired in the 77 remaining acres. Therefore, we assume for this opinion that the only damages paid with respect to the remaining acreage were severance damages—not an acquisition of an interest in the property.

Severance damages are defined in Wis. Stat. § 32.09(6)(e) as:

ing the jurisdictional offer, which led to a separate lawsuit on December 28, 2007, *Wisconsin Bureau of Aeronautics v. Steven Wickenhauser,* No. 2007CV1210 (St. Croix County Circuit Court). This condemnation suit against the Wickenhauser property is completely separate from this case.[6]

> Damages resulting from actual severance of land including damages resulting from severance of improvements or fixtures and proximity damage to improvements remaining on condemnee's land. In determining severance damages under this paragraph, the condemnor may consider damages which may arise during construction of the public improvement, including damages from noise, dirt, temporary interference with vehicular or pedestrian access to the property and limitations on use of the property. The condemnor may also consider costs of extra travel made necessary by the public improvement based on the increased distance after construction of the public improvement necessary to reach any point on the property from any other point on the property.

All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

The City asserts that the severance damages paid to the Wickenhausers preclude an inverse condemnation claim for the 77 remaining acres. The City relies on *Hoekstra v. Guardian Pipeline, LLC,* 2006 WI App 245, ¶ 13, 298 Wis. 2d 165, 726 N.W.2d 648, which states that "[s]everance damages are defined as 'the diminution in the fair market value of the remaining land that occurs because of a taking.'" (citations and internal quotation marks omitted). However, severance damages represent the loss of the value to the land due to the severance of the land, not the loss of value due to new or increased overflights. Therefore, the Wickenhausers' claim is still alive for the land not included in the direct condemnation action. However, if the court calculates diminution of the fair market value of the land, it must consider that damages were already paid for the diminution of value that was attributable to the severance.

[6] For discussion of the impact of the condemnation case on this action, see ¶ 13 n.5, *supra,* and ¶¶ 33 and 86, *infra.*

¶ 14. The present case was filed December 13, 2007, by Brenner, the Wickenhausers, and the Seidlings. These landowners alleged inverse condemnation, nuisance, and trespass. To perfect their claim, they filed a verified petition for inverse condemnation, under Wis. Stat. § 32.10, in June 2008.

¶ 15. After a number of motions and pretrial proceedings designed in part to clarify the issues, the case proceeded to a court trial before Judge Cameron on June 10 and July 10, 2009. The landowners and their witnesses focused on the adverse effects created by additional aircraft flying in new flight patterns at the Airport, while the City emphasized that much of the value of the respective properties had not been lost.

### Robert Brenner

¶ 16. Robert Brenner lived on his property with his fiancée and her daughter. A licensed pilot, Brenner testified that because of the runway extension, crosswinds caused aircraft to fly directly over his property, sometimes at less than 100 feet in altitude.

¶ 17. While some of Brenner's testimony indicated that aircraft travelled over his house during the FAA recommended approach, he also indicated that some pilots did not follow "the standard traffic patterns" and showed "[t]otal disregard for any traffic regulations or rules."

¶ 18. During the first day of the trial, Brenner offered video evidence of this claim and testified: "[Y]ou will see how aircraft totally disregard the air traffic patterns that are . . . set up by the FAA, and how they deliberately fly over either my house or Steve's house." The City objected to this testimony, asking the court: "How can the City be responsible for what pilots do when they're acting illegally and contrary to FAA regulations?"

330

¶ 19. Brenner also testified that "this is an uncontrolled airport; and so pilots can do basically whatever they want, and . . . actually—you know, it's the pilot's responsibility, but it's also the airport's responsibility to ensure proper traffic patterns are followed."

¶ 20. Brenner testified that, after the expansion, residing in his home had been a "living nightmare." He testified about helicopters flying in and out at all hours of the night. He testified that jets that could not previously use the shorter runway are now flying in and out of the airport. He testified that, since the extension of the runway, air traffic has increased and that his whole family's sleep is interrupted because of the noise of the airport and the flashing strobe lights at night during landings and take-offs. He testified that he and his family cannot sit outside and have a conversation or a picnic or a cookout because of the noise. He testified to being concerned about safety issues because the planes fly close to the house, noting that the power lines in front of his home were lowered ten feet from their original level because the aircraft were getting dangerously close. He testified about the debris and dust kicked up by the jets, as well as the kerosene smell.

¶ 21. Brenner complained about vibrations in his home, particularly with the windows. The 9–year-old daughter of his fiancée testified that, at one time, she was mixing a cake for her grandmother and vibrations from a plane flying over caused the bowl of cake mix to vibrate off the table and break on the floor. She also testified that the noise often wakes her up at night and is scary.

### The Seidlings

¶ 22. The Seidlings have lived on their property since about 1991. Allan Seidling testified that he can

feel vibrations while he is sitting in the house when planes come in. He described the odor drifting in from the east. He said he had installed air conditioning but would rather have his windows open. He testified it was hard to have conversations outside the house. Susan Seidling testified that she and her husband do not host family gatherings because people complain about the noise. She said the strobe light from the Airport is bothersome in the winter. She said that even with a fan in the house, the loud helicopters still create a noise problem. She also testified that aircraft caused her china hutch to shake.

¶ 23. Allan Seidling expressed fear about his family's safety because of the decreased altitude of the aircraft flying over their house and property. He testified that he was afraid to fly kites because they might hit approaching aircraft.

### The Wickenhausers

¶ 24. The Wickenhausers have lived on their property since 1987, although Steven Wickenhauser owned the property in the early 1980s. In addition to the house, there is a large dairy barn, bunker silos, and other improvements on the property. The Wickenhausers objected to diminution of their property value and "inconvenience, nuisance, annoyance, discomfort and emotional distress from the lights, smoke, noise, disruption, vibration, smell, trespass onto private property, and significant safety concerns" caused by the extension and increased use of the Airport. Respondent's Brief, at 14. Steven Wickenhauser indicated that planes sometimes disrupt his sleeping. He said his windows and china rattle because of vibration. The State has apparently indicated an intent to cut down trees near the Wickenhausers' house.

332

¶ 25. The City, of course, offered rebuttal testimony, and the circuit court was impressed by some of the remedial efforts that the Airport had taken, including the installation of a launch pad buffer zone, and a "blast pad . . . to control dust and erosion." The court found that there is no longer a medical helicopter stationed at the Airport and that the main jet that used the Airport is no longer hangared there.

¶ 26. There was mixed testimony about the number of planes using the Airport following extension of the runway. The court found that "usage by jet aircraft had increased by 2/3," according to an exhibit, but that the number of aircraft on instrumental flight plans (IFP) appeared to decrease at night and was the same in 2008 as it was before the expansion. The City showed that recreational use of the Airport had declined.

¶ 27. The City was adamant that it should not be responsible for pilots who deviate from FAA flight patterns in taking off or landing. It also contended that there had been no taking of the respective properties because they had not been reduced to almost no value for all uses.

¶ 28. The circuit court, relying on the testimony of James Rawson, a real estate appraiser, found that the highest and best use of the Wickenhauser property is agriculture and in ten years, light industrial. It added:

> The effect of the runway was a reduction in value of 5–15 percent and at most 20 percent. Rawson said the best use of the Seidling property is rural residential. He testified the airport has a 5–10 percent impact on the property value. As to the Brenner property the highest and best use was rural residential. The Court concludes that all the properties still maintain much of their value even with the airport addition.

¶ 29. The court also found that airplanes and helicopters use the space above the home and property of each plaintiff. "The Defendants concede that as a result of the [runway] extension there has been a diminution in the peaceful and quiet use of the plaintiffs' homes for residential homes and there has been a reduction in the value of the homes and the Court would concur."

¶ 30. Nevertheless, the court distinguished *United States v. Causby,* 328 U.S. 256 (1946), and said:

> Having considered all of the arguments presented, the Court concludes that for a taking by the government to be compensable, the property owner must be deprived of all or practically all of the beneficial use of the property or of any part. The Court must consider the whole property and not just a portion of each of the plaintiffs' property. . . . While the Court is sympathetic with the Plaintiffs in this action, it is not the law that a person who loses some enjoyment of their property has suffered an unconstitutional taking. In the present case, the flights over the private land of the Plaintiffs are not a taking because they have not rendered the subject property uninhabitable or destroyed existing business on the property.

¶ 31. The court also dismissed the landowners' trespass and nuisance claims.

¶ 32. The court of appeals reversed. The court of appeals distinguished regulatory takings from actual occupation takings, determining that a party need not show that he or she has been deprived of all or substantially all value of his or her property in an actual occupation case. *Brenner,* No. 2010AP342, unpublished slip op., ¶ 9. The court said that in an actual occupation case, "the occupation *is* the taking. If the rule were

otherwise, then public entities would rarely be required to compensate property owners for taking easements." *Id.*

¶ 33. In addition, the court of appeals noted that the circuit court did not address whether the FAA recommended flight path was over other parts of the landowners' properties or whether the aircraft deviated from that path. *Id.,* ¶ 11. It determined that the Wickenhausers could not recover in this action for the 3.813 acres covered by the avigation easement, only the 77 acres not covered by the easement. *Id.,* ¶ 13. The court of appeals remanded the case to the circuit court to make further findings of fact as necessary to determine whether a taking had occurred.

¶ 34. We accepted the Airport's petition for review and now affirm.

## II. STANDARD OF REVIEW

¶ 35. "Whether government conduct constitutes a taking of private property without just compensation is a question of law that this court reviews de novo." *E-L Enters. v. Milwaukee Metro. Sewerage Dist.,* 2010 WI 58, ¶ 20, 326 Wis. 2d 82, 785 N.W.2d 409. Interpretation of statutes, such as Wis. Stat. § 32.10, also is a question of law that this court reviews de novo.

¶ 36. We accept the findings of fact made by the circuit court unless they are clearly erroneous.

## III. ANALYSIS

¶ 37. The Fifth Amendment to the United States Constitution provides, in pertinent part, as follows: "Nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

¶ 38. The Takings Clause of the Fifth Amendment is applied to the States through the Fourteenth Amendment. *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* ___ U.S. ___, 130 S. Ct. 2592, 2597 (2010); *Chicago, Burlington & Quincy R.R. Co. v. Chicago,* 166 U.S. 226, 239 (1897).

¶ 39. Article I, Section 13 of the Wisconsin Constitution provides as follows: "The property of no person shall be taken for public use without just compensation therefor." Wis. Const. art. I, § 13.

¶ 40. In Wisconsin, the government may acquire property by various means, including gift, purchase at an agreed price, or condemnation. Wis. Stat. § 32.02. When government condemns property for public use, it must act in conformity with the cited constitutional provisions on eminent domain and Chapter 32 of the Wisconsin Statutes. *See, e.g.,* Wis. Stat. § 32.05: *Condemnation for sewers and transportation facilities.* Condemnation, which often involves an element of compulsion, frequently raises challenges about the purpose of the taking, the extent of the taking, and whether the compensation offered or paid for a taking is "just compensation."

¶ 41. There are other situations in which government does not seek to acquire property directly, but it effectively controls property by regulation, or takes property by other action, whether the government wishes to or not. In these situations, a property owner may bring suit for compensation from the government entity that "took" the owner's property without formally exercising its power of condemnation. These actions by property owners seeking compensation for takings are called inverse condemnation. *See Black's Law Dictio-*

336

*nary* 332 (9th ed. 2010); *Koskey v. Town of Bergen,* 2000 WI App 140, ¶ 1 n.1, 237 Wis. 2d 284, 614 N.W.2d 845; *Hillcrest Golf & Country Club v. City of Altoona,* 135 Wis. 2d 431, 435 n.1, 400 N.W.2d 493 (Ct. App. 1986).

¶ 42. In Wisconsin, inverse condemnation claims are filed under Wis. Stat. § 32.10. This statute reads as follows:

> *Condemnation proceedings instituted by property owner.* If any property has been occupied by a person possessing the power of condemnation and if the person has not exercised the power, the owner, to institute condemnation proceedings, shall present a verified petition to the circuit judge of the county wherein the land is situated asking that such proceedings be commenced. The petition shall describe the land, state the person against which the condemnation proceedings are instituted and the use to which it has been put or is designed to have been put by the person against which the proceedings are instituted. A copy of the petition shall be served upon the person who has occupied petitioner's land, or interest in land. The petition shall be filed in the office of the clerk of the circuit court and thereupon the matter shall be deemed an action at law and at issue, with petitioner as plaintiff and the occupying person as defendant. The court shall make a finding of whether the defendant is occupying property of the plaintiff without having the right to do so. If the court determines that the defendant is occupying such property of the plaintiff without having the right to do so, it shall treat the matter in accordance with the provisions of this subchapter assuming the plaintiff has received from the defendant a jurisdictional offer and has failed to accept the same and assuming the plaintiff is not questioning the right of the defendant to condemn the property so occupied.

¶ 43. In six places, Wis. Stat. § 32.10 uses some form of the word "occupy." The precise meaning of

"occupy" is sometimes problematic. In any event, the procedure set out in § 32.10 has been used by property owners seeking compensation for a "taking," whether the alleged taking results from government regulation or from physical occupation.

█

¶ 44. This court discussed regulatory takings in *Eberle v. Dane County Board of Adjustment,* 227 Wis. 2d 609, 595 N.W.2d 730 (1999). It explained that a taking need not arise from an actual physical occupation of property. *Id.* at 621 (citing *Howell Plaza, Inc. v. State Highway Comm'n,* 92 Wis. 2d 74, 81, 284 N.W.2d 887 (1979) (*Howell II*)). However, "[a] taking can occur absent physical invasion only where there is a legally imposed restriction upon the property's use." *Howell II,* 92 Wis. 2d at 88.

¶ 45. Citing *Zealy v. City of Waukesha,* 201 Wis. 2d 365, 374, 548 N.W.2d 528 (1996), the *Eberle* court recognized the sine qua non for a regulatory taking—a regulation must deny the property owner all or substantially all practical uses of a property in order to be considered a taking for which compensation is required. *Eberle,* 227 Wis. 2d at 622.

¶ 46. The Supreme Court's decision in *Lingle v. Chevron U.S.A., Inc.,* 544 U.S. 528, 537–38 (2005), discussed other standards related to regulatory takings, including "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." (citing *Lucas v. S.C. Costal Council,* 505 U.S. 1003, 1019 (1992)). But the standard to be applied in Wisconsin is stated in *Eberle* and *Zealy.*

¶ 47. The circuit court concluded that the circumstances in this case do not show a regulatory taking. We agree. Consequently, the circuit court should not have applied the standard for a regulatory taking.

¶ 48. The other form of taking involves "actual physical occupation" of private property. *E-L Enters.*, 326 Wis. 2d 82, ¶ 22 (quoting *Howell Plaza, Inc. v. State Highway Comm'n*, 66 Wis. 2d 720, 726, 226 N.W.2d 185 (1975) (*Howell I*)); *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).

■■

¶ 49. The *Loretto* Court observed that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 426. Something less than *permanent* occupation of property also can amount to a taking. "[E]ven if the Government physically invades only an easement in property, it must nonetheless pay just compensation." *Kaiser Aetna v. United States*, 444 U.S. 164, 180 (1979).

¶ 50. In *E-L Enterprises*, the Milwaukee Metropolitan Sewerage District drained groundwater near and under E-L's building to facilitate the construction of sewer pipe parallel to E-L's property. Removal of the groundwater caused 14 wood piles that were supporting E-L's building to rot. E-L's takings claim fluctuated between a "taking" of the wood piles and a "taking" of the groundwater. Because E-L did not prove "the value of the extracted groundwater," *E-L Enterprises*, 326 Wis. 2d 82, ¶ 5, the court focused on the alleged taking of the wood piles and concluded that "the Sewerage District *did not physically occupy* the property for which E-L seeks compensation." *Id.* (emphasis added). It decided the case by denying compensation for "mere consequential damages to property resulting from governmental action." *Id.*

■

¶ 51. The property owners here assert that the extension of the Airport runway has led to actual

occupation of the airspace over their land—airspace in which they have a recognized property interest. This thesis rests in part on the landmark Supreme Court decision in *Causby.*

¶ 52. *Causby* involved frequent and regular flights of Army and Navy aircraft over a residence and chicken farm in North Carolina. *Id.* at 258. The aircraft passed directly over the property at a height of 83 feet, along a path approved by the Civil Aeronautics Authority.[7] *Id.* The aircraft were so close to the property that they barely missed the tops of the trees. *Id.* at 259. The aircraft were so disruptive to the Causby property that 150 chickens on the farm were killed when they flew "into the walls from fright," and the property owners had to give up their business.[8] *Id.*

¶ 53. The *Causby* Court addressed whether a taking had occurred and what the test for such a taking would be. The Court needed to grapple with common law doctrine relating to land ownership. Justice William O. Douglas wrote:

> It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum.* But that doctrine has no place in the modern world. The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Com-

---

[7] The Civil Aeronautics Authority has been replaced by the Federal Aviation Administration. *See generally The Federal Aviation Administration,* 21 Cath. U. L. Rev. 732 (1972).

[8] The Court also stated: "Respondents are frequently deprived of their sleep and the family has become nervous and frightened." *United States v. Causby,* 328 U.S. 256, 259 (1946). These concerns are similar to claims made by the plaintiffs.

mon sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim.

*Id.* at 260–61.

¶ 54. The Court recognized that Congress had placed into the public domain, as a public highway, the navigable airspace above the minimum safe altitude of flight—then 500 feet by day and 1000 feet by night for air carriers. *Id.* at 263. However, the Court recognized that if a property owner is to have full enjoyment of his land, he must have "exclusive control of the immediate reaches of the enveloping atmosphere," the "superadjacent airspace" below the altitude that Congress appropriately determines to be a public highway. *Id.* at 264–65.

¶ 55. Thus, the Court determined that, "Flights over private land are not a taking, *unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land.*" *Id.* at 266 (emphasis added). The Court agreed with the Court of Claims that "a servitude" had been imposed upon the Causby land. *Id.* at 267.

¶ 56. While *Causby* involved flights by government aircraft, the United States Supreme Court later addressed the applicability of *Causby* to private flights landing at and departing from airports owned and operated by local municipalities. *Griggs v. Allegheny Cnty.,* 369 U.S. 84 (1962).

¶ 57. In *Griggs,* Allegheny County in Pennsylvania owned and operated the Greater Pittsburgh Airport, which the county had designed in conformance with Civil Aeronautics Administration rules and regulations. *Id.* at 85. The county designed the airport in

341

such a way that one approved glide angle for aircraft was 81 feet above the ground or 11.36 feet above the chimney of a property owner. *Id.* at 86. All flights remained within Civil Aeronautics Administration recommendations, but they were regularly at an altitude of 30 feet above the property owner's residence. *Id.* at 86–87.

¶ 58. The *Griggs* court dealt with the questions of whether *Causby* remained good law after Congress had redefined navigable airspace to include space necessary for takeoffs and landings, and whether a county could be liable for flights that take off and land at its airport. The Court concluded that the legislative definition of navigable airspace did not necessarily determine whether a taking could occur. *Id.* at 88–89. The Court also held that, on the facts and law before it, the county could be liable for a taking. *Id.* at 89–90.

¶ 59. One of the early United States Court of Appeals decisions interpreting *Causby* and *Griggs* was *Palisades Citizens Association v. Civil Aeronautics Board,* 420 F.2d 188, 192 (D.C. Cir. 1969). The court said:

> It is true that Congress, by statute, has declared "exclusive national sovereignty in the airspace of the United States" and has defined navigable airspace as all airspace "above the minimum altitudes of flight prescribed by regulations." However, "[r]egardless of any congressional limitations, the land owner, as an incident to his ownership, has a claim to the superadjacent airspace" to the extent that a reasonable use of his land involves such space. Accordingly, an "invasion of the 'superadjacent airspace' will often 'affect the use of the surface land itself.'" Moreover, where that invasion is destructive of the landowner's right to possess and use his land, it is compensable either through private tort

actions or under the fifth amendment where the use, by
the government, amounts to a "taking."

*Id.* (citations omitted).

¶ 60. *Causby* and *Griggs* represent the controlling
law with respect to "takings" of private property by
aircraft overflights. In applying these cases to the
present litigation, we underscore the fact that our
analysis is directed to three purported uncompensated
"takings" of private property under constitutional stan-
dards. Our analysis does not address potential remedies
a property owner may have in tort. It is confined to
whether the Airport is responsible for a partial "taking"
of plaintiffs' property in a "constitutional sense."

¶ 61. *Causby* concluded that the overflights of
military aircraft had imposed a "servitude" upon
Causby's land. *Causby,* 328 U.S. at 267. The Court
added that, "The Court of Claims held . . . that an
easement was taken." *Id.* In *Griggs,* the Court described
the *Causby* taking as the " 'taking,' in the constitutional
sense, of an air easement for which compensation must
be made." *Griggs,* 369 U.S. at 88. The Court added,
upon the facts of that case:

> The Federal Government takes nothing [from its role in
> helping to develop the Greater Pittsburgh Airport]; it is
> the local authority [Allegheny County] which decides to
> build an airport *vel non,* and where it is to be located.
> We see no difference between its responsibility *for the
> air easements necessary for operation of the airport* and
> its responsibility for the land on which the runways
> were built.

*Id.* at 89 (emphasis added). The Court went on:

> The glide path for the northeast runway is as
> necessary for the operation of the airport as is a surface
> right of way for operation of a bridge, or as is the land

for the operation of a dam. As stated by the Supreme Court of Washington in *Ackerman v. Port of Seattle,* 55 Wash. 2d 401, 413, 348 P.2d 664, 671, " . . . an adequate approach way is as necessary a part of an airport as is the ground on which the airstrip, itself, is constructed . . . ." Without the "approach areas," an airport is indeed not operable. [Allegheny County] in designing [the airport] had to acquire some private property. Our conclusion is that by constitutional standards it did not acquire enough.

*Id.* at 90 (citation omitted).

¶ 62. Strict adherence to property principles limits the application of eminent domain. The government cannot "take" private property from a person if the person does not have an interest in the property. Generally speaking, a landowner has a three dimensional property interest in airspace: The person has a property interest in the block of air that is bounded by the length and width of the person's land holdings (i.e., Brenner's five acres) and rises up to approximately the height of the government-defined minimum safe altitude of flight. Physical invasions of this superadjacent airspace *may* constitute a taking. Generally speaking, actions that occur outside or above this block of air do not constitute a taking, even if the actions have adverse consequences to the person's property.

¶ 63. Stated differently, flights that are not directly over a person's property cannot "take" the person's property. Flights that are *above* the government-defined minimum safe altitude of flight are very unlikely to take a person's property. But overflights that invade the person's superadjacent block of airspace, even takeoffs and landings, may constitute a taking for which compensation is required.

¶ 64. Thus, the standard for a taking in an airplane overflight case is very different from the standard applied by the circuit court. The standard for a taking in an airplane overflight case is whether the overflights have been low enough—that is, invasions of a person's block of superadjacent airspace—and frequent enough to have a direct and immediate effect on the use and enjoyment of the person's property. If this standard can be satisfied, the government has "taken" an easement without paying compensation for it. Because the circuit court applied the much more stringent standard of a regulatory taking, the circuit court erred. As the court of appeals directed, this case must be remanded to the circuit court to apply the correct standard.

¶ 65. The principles stated about the taking of an avigation easement have engendered considerable controversy throughout the nation. We discuss several of the attendant issues in an effort to assist the circuit court.

¶ 66. There is some uneasiness in a holding that courts will recognize damages for a taking caused by government-authorized action that occurs inside a block of air but not recognize damages emanating from government-authorized action outside that block of air, even though the consequences for property owners may be identical. The theory behind the dimensional distinction is set out in *Batten v. United States,* 306 F.2d 580 (10th Cir. 1962), the leading case in disallowing claims of noise and smoke damage from a nearby airport when direct overflights were not at issue. In *Batten,* the majority said:

> The case at bar is one of first impression in the federal appellate courts and presents an issue of widespread current interest. The jet airplane is a great boon

to the traveler but a veritable plague to the homeowners near an airfield. The noise, vibration, and smoke incidental to the operation and maintenance of jet planes disturb the peace and quiet in every residential area located near an airport used by the jets. This disturbance is felt not only by those whose property is crossed by the planes on take-offs or landings but also by those who live outside of the established flight patterns. The Supreme Court has allowed recovery under the Tucker Act to a landowner whose property was crossed by low-elevation flights of military planes on take-offs and landings. The novelty in the instant case is that liability is asserted not because of disturbance in conjunction with any overflights but because of the noise, vibration, and smoke alone which harass the occupants of nearby properties. The amount of harassment varies with the proximity of the property to the scene of jet operations.

No amount of sympathy for the vexed landowners can change the legal principles applicable to their claims. We do not have either a tort or a nuisance case. The plaintiffs sue under the Tucker Act and whether the applicability of that Act depends on a taking without compensation in violation of the Fifth Amendment or on an implied promise to pay for property taken, the claims are founded on the prohibition of the Fifth Amendment, "nor shall private property be taken for public use, without just compensation."

In construing and applying this constitutional provision the federal courts have long and consistently recognized the distinction between a taking and consequential damages.

. . . .

Because of this rule which denies the recovery of consequential damages in the absence of any taking, many state constitutions provide in substance that private property shall not be taken or damaged for public use without compensation. However, the federal

346

obligation has not been so enlarged either by statute or by constitutional amendment.

. . . .

The vibrations which cause the windows and dishes to rattle, the smoke which blows into the homes during the summer months when the wind is from the east, and the noise which interrupts ordinary home activities do interfere with the use and enjoyment by the plaintiffs of their properties. Such interference is not a taking. The damages are no more than a consequence of the operations of the Base and as said in *United States v. Willow River Power Co.*, [324 U.S. 499 (1945)], they "may be compensated by legislative authority, not by force of the Constitution alone." As we see the case at bar, the distinctions which the Supreme Court has consistently made between "damages" and "taking" control and compel denial of recovery.

*Id.* at 583–85.

¶ 67. 7A *Nichols on Eminent Domain* § G14.02[2][a] (3d ed. 2012) views *Batten* as the majority rule but quotes at length from the dissenting opinion of Judge Alfred Murrah and cites exceptions.[9]

¶ 68. Some of these exceptions rely on tort theories to provide a remedy. In this case, the circuit court should adhere to property principles in determining whether there have been "takings" of air easements by invasions of the property owners' superadjacent airspace. This decision is not intended to address possible tort claims.

---

[9] *See e.g., Foster v. City of Gainsville,* 579 So. 2d 774 (Fla. Dist. Ct. App. 1991); *Alevizos v. Metro. Airports Comm'n of Minneapolis & St. Paul,* 216 N.W.2d 651 (Minn. 1974); *Thornburg v. Port of Portland,* 376 P.2d 100 (Or. 1962); *City of Austin v. Travis Cnty. Landfill,* 25 S.W.3d 191 (Tex. App. 1999); *Martin v. Port of Seattle,* 391 P.2d 540 (Wash. 1964).

¶ 69. On remand, there may be a dispute about the height of the property owner's superadjacent airspace—namely, where does it end? Throughout the country, there have been disagreements about whether takings could ever occur above the minimum safe altitude of flight, and what the minimum safe altitude of flight is in a given circumstance.

¶ 70. In 1946, *Causby* identified the minimum safe altitude as 500 feet by day and 1000 feet by night. *Causby,* 328 U.S. at 263–64. In 1962, *Batten,* 306 F.2d at 585, identified the minimum safe altitude as 1000 feet over congested areas and 500 feet over sparsely populated areas, citing a section of the Code of Federal Regulations.

¶ 71. We take note of 14 C.F.R. § 91.119, which reads as follows:

> Except when necessary for takeoff or landing, no person may operate an aircraft below the following altitudes:
>
> (a) *Anywhere.* An altitude allowing, if a power unit fails, an emergency landing without undue hazard to persons or property on the surface.
>
> (b) *Over congested areas.* Over any congested area of a city, town, or settlement, or over any open air assembly of persons, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft.
>
> (c) *Over other than congested areas.* An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In those cases, the aircraft may not be operated closer than 500 feet to any person, vessel, vehicle, or structure.

(d) Helicopters, powered parachutes, and weight-shift-control aircraft. If the operation is conducted without hazard to persons or property on the surface—

(1) A helicopter may be operated at less than the minimums prescribed in paragraph (b) or (c) of this section, provided each person operating the helicopter complies with any routes or altitudes specifically prescribed for helicopters by the FAA; and

(2) A powered parachute or weight-shift-control aircraft may be operated at less than the minimums prescribed in paragraph (c) of this section.

14 C.F.R. § 91.119 (2011).

¶ 72.　One commentator has suggested that tying takings to the minimum safe altitude of flight—known as the "fixed height" theory—"misread[s] the Supreme Court's analysis." Colin Cahoon, Comment, *Low Altitude Airspace: A Property Rights No-Man's Land,* 56 J. Air L. & Com. 157, 171 (1990). The Cahoon article, which lays out six separate theories of airspace ownership, asserts that the Supreme Court rejected the "fixed height" theory by its reasoning in such cases as *Griggs. Id.* at 179–81. "If the 'fixed height' theory were to be followed to its logical conclusion, no taking could have occurred, since the planes flying over Mr. Griggs' house were within navigable airspace." *Id.* at 180. The Cahoon article cites Section 159 of the Restatement (Second) of Torts (1965),[10] *Branning v. United States,* 654 F.2d 88 (Ct. Cl. 1981), aff'd 784 F.2d 361 (Fed. Cir. 1986), and *Stephens v. United States,* 11 Cl. Ct. 352 (1986), among

---

[10] "(2) Flight by aircraft in the air space above the land of another is a trespass if, but only if, (a) it enters into the immediate reaches of the air space next to the land, and (b) it interferes substantially with the other's use and enjoyment of his land." Restatement (Second) of Torts § 159 (1965).

authorities that do not strictly adhere to the "fixed height" theory. Cahoon, *supra,* at 182, 189–90, 194.

¶ 73. There are competing answers in the case law regarding whether the congressional definition of navigable airspace and the minimum safe altitude of flight preclude a taking at a height greater than the minimum safe altitude of flight.[11] We need not decide this question because the allegations in the record are that aircraft were frequently travelling below the minimum safe altitude in flights over the plaintiffs' property. However, there are several factors that merit consideration for future cases.

---

[11] *Kirk v. United States,* 451 F.2d 690 (10th Cir. 1971) (holding that isolated high altitude flights did not effect taking); *Argent v. United States,* 124 F.3d 1277 (Fed. Cir. 1997) (discussing cases); *Branning v. United States,* 654 F.2d 88 (Ct. Cl. 1981) (rejecting the minimum safe altitude as the measure of taking when an increase in noise and aircraft created a further taking, while recognizing that noise alone from navigable airspace is not enough to effect a taking); *Aaron v. United States,* 311 F.2d 798, 801 (Ct. Cl. 1963) (holding that recovery could not be had for flights above the minimum safe altitudes unless the flights amounted to a "practical destruction" of the property); *A.J. Hodges Indus., Inc. v. United States,* 355 F.2d 592, 594 (Ct. Cl. 1966) ("The courts have held that when regular and frequent flights by Government-owned aircraft over privately owned land at altitudes of less than 500 feet from the surface of the ground constitute a direct, immediate, and substantial interference with the use and enjoyment of the property, there is a taking by the Government of an avigation easement, or easement of flight, in the airspace over the property, and that this taking is compensable under the Fifth Amendment to the Constitution."); *Lacey v. United States,* 595 F.2d 614 (Ct. Cl. 1979) (holding that a taking can occur only below 500 feet, the minimum safe altitude of flight); *Matson v. United States,* 171 F. Supp. 283 (Ct. Cl. 1959) (allowing recovery only for those flights under 500 feet).

¶ 74. First, Wis. Stat. § 114.03 provides:

*Landowner's rights skyward.* The ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath, subject to the right of flight described in s. 114.04.

This section, as well as sections 114.04 and 114.07,[12] come word for word from the Uniform Law for Aeronautics (1922), which was approved by the Wisconsin legislature in 1929. Chapter 348, Laws of 1929. The Uniform Law embodied a "Public Easement Theory" which the Cahoon article summarizes as follows:

2. *Public Easement Theory*

This theory espoused the idea that the owner in fact owns the airspace above his property, but that

---

[12] Wisconsin Stat. § 114.04 provides:

*Flying and landing, limitations.* Flight in aircraft or spacecraft over the lands and waters of this state is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or unless so conducted as to be imminently dangerous or damaging to persons or property lawfully on the land or water beneath. The landing of an aircraft or spacecraft on the lands or waters of another, without the person's consent, is unlawful, except in the case of a forced landing. For damages caused by a forced landing, however, the owner or lessee of the aircraft or spacecraft or the aeronaut or astronaut shall be liable, as provided in s. 114.05.

Wisconsin Stat. § 114.07 provides:

*Criminal jurisdiction.* All crimes, torts and other wrongs committed by or against an aeronaut, astronaut, or passenger while in flight over this state shall be governed by the laws of this state; and the question whether damage occasioned by or to an aircraft or spacecraft while in flight over this state constitutes a tort, crime or other wrong by or against the owner of such aircraft or spacecraft, shall be determined by the laws of this state.

351

property is subject to a public easement to aviation traffic. This theory is one of two modifications to the *ad coel[u]m* rule. That the owner does in fact own all the airspace above his property is recognized, but aviation is legally afforded a property right (easement) to traverse this property. Flight over the property is only actionable in the event the easement is misused.

Cahoon, *supra,* at 164.

¶ 75. Interpretation of Wis. Stat. § 114.03 has to mesh with the Supreme Court's interpretations of Congress's power to regulate air navigation under the commerce clause. However, unless Congress has adopted the minimum safe altitude of flight as the ceiling to a property owner's superadjacent airspace, the Wisconsin statute may permit the recognition of direct and immediate injuries to property from overflights above the minimum safe altitude of flight.[13]

¶ 76. Second, the minimum safe altitude of flight for helicopters can be less than the minimum safe altitude of airplanes, provided that "each person operating the helicopter complies with any routes or altitude specifically prescribed for helicopters by the FAA." 14 C.F.R. § 91.119(d)(1). This is an exception to a "fixed height" theory. The fact that an authorized flight plan could regularly send helicopters into a property owner's superadjacent airspace would not mean that these flights would not constitute the taking of an easement.

¶ 77. Third, setting a "fixed height" ceiling for a property owner's superadjacent airspace may facilitate a relatively easy determination of one factor in an overflight takings analysis. However, arbitrary lines can

---

[13] Wisconsin Stat. § 114.07 recognizes crimes and torts committed in the air above Wisconsin, irrespective of the minimum safe altitude of flight.

produce unfair results, and arbitrary height lines are likely to accelerate the development of tort remedies. Consequently, some think it would be better for the law to presume a non-taking by overflights above the minimum safe altitude of flight, but permit property owners to overcome the presumption with compelling proof in egregious circumstances. *See* Cahoon, *supra,* at 188.

¶ 78. There is another critical consideration for the circuit court that injects a fourth "dimension" into the determination of a taking. That dimension is time, evidenced by the element of "frequency."

¶ 79. As noted, the *Loretto* Court concluded that "a *permanent* physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto,* 458 U.S. at 426 (emphasis added.) "When faced with a constitutional challenge to a *permanent* physical occupation of real property, this Court has invariably found a taking." *Id.* at 427 (emphasis added). "We affirm the traditional rule that a *permanent* physical occupation of property is a taking." *Id.* at 441 (emphasis added).

¶ 80. *Loretto* discussed *Causby* approvingly, noting that there was a "distinction between a permanent physical occupation, a physical invasion short of an occupation, and a regulation that merely restricts the use of property." *Id.* at 430. *Loretto* stressed the "frequent flights" in *Causby, id.,* and asserted that the damages to the respondents in *Causby* "were not merely consequential. They were the product of a direct invasion of the respondents' domain." *Id.* at 431 (quoting *Causby,* 328 U.S. at 265–66).

¶ 81. In airplane overflight cases, a "permanent" occupation of property is not necessary. However, the second sentence in *Causby* speaks of "frequent and

regular flights," *Causby,* 328 U.S. at 258, and the Court's holding refers to flights that are "so low *and so frequent* as to be a direct and immediate interference with the enjoyment and use of the land." *Id.* at 266 (emphasis added). In short, isolated, irregular invasions of a property owner's superadjacent airspace may be annoying but they do not necessarily amount to a taking in a constitutional sense. "Frequency" is an important element of proof in overflight cases.

¶ 82. The City has urged the court to add another factor to the test for whether a taking has occurred. It contends that only those overflights that follow FAA-approved flight plans should be considered in determining a taking—that the City cannot be held responsible for overflights that disregard FAA-approved flight plans. We cannot agree with this contention.

¶ 83. It is true that government action of some sort is a prerequisite for a taking under the constitution. Cases applying *Causby* often involve government aircraft.[14] But government also is liable for a taking when it authorizes physical occupation. *Loretto,* 458 U.S. at 426. A city that designs and builds an airport is liable for aircraft using the airport when those aircraft invade surrounding property owners' superadjacent airspace because the city has not acquired enough property. *Griggs,* 369 U.S. 84, 90.

---

[14] *E.g., Causby,* 328 U.S. 256 (military aircraft); *Argent,* 124 F.3d 1277 (Navy aircraft); *Brown v. United States,* 73 F.3d 1100 (Fed. Cir. 1996) ("United States Air Force planes"); *Persyn v. United States,* No. 96–5033, unpublished op., 106 F.3d 424 (Fed. Cir. Dec. 27, 1996) (government aircraft); *A.J. Hodges,* 355 F.2d at 594 ("Government-owned aircraft over privately owned land").

¶ 84. In this case, the Airport manager testified that pilots were following the FAA recommended approach patterns and that he worked to enforce those standards. Brenner testified that pilots would deviate from those standards, especially in high winds. A city cannot operate an airport and permit some of the aircraft that use it to disregard established FAA flight paths. The City bears responsibility if aircraft are regularly deviating from FAA flight patterns and those deviations result in invasions of the superadjacent airspace of neighboring property owners with adverse effects on their property. The City is in a far superior position to enforce the FAA's flight standards than the property owners. Placing the burden on the property owners to seek enforcement against individual airlines or pilots would effectively deprive the owners of a remedy for takings of their property.

¶ 85. The record does not contain sufficient factual findings by the circuit court to resolve this case. We remand to the circuit court to make further factual findings and to determine whether takings have occurred. After the circuit court has made further factual findings, it must apply the standard set forth in this decision.

¶ 86. We note that the Wickenhausers' claim in this action relates only to the 77 acres not included in the separate condemnation action. Direct condemnation actions and inverse condemnation actions are mutually exclusive. *See Maxey v. Redevelopment Authority of Racine*, 94 Wis. 2d 375, 288 N.W.2d 794 (1980); Wis. Stat. § 32.10. Should the circuit court find that a taking occurred with respect to the 77 remaining acres of the Wickenhauser property, it must consider that severance

damages were paid on that property when it calculates just compensation. *See,* ¶ 13 n.5, *supra.*

## IV. CONCLUSION

¶ 87. The Takings Clause of the Fifth Amendment and the equivalent provision in Article I, Section 13 of the Wisconsin Constitution do not prohibit the taking of private property for public use, but instead place a condition on the exercise of that power. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314 (1987). These provisions are designed "not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 315.

¶ 88. The creation and expansion of airports is usually deemed a public good. But that good frequently comes at a significant cost to neighboring landowners. This cost cannot be ignored.

¶ 89. "One of the principal purposes of the Takings Clause is 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Dolan v. City of Tigard,* 512 U.S. 374, 384 (1994) (quoting *Armstrong v. United States,* 364 U.S. 40, 49 (1960)).

¶ 90. We affirm the decision of the court of appeals. We conclude that a taking occurs in airplane overflight cases when government action results in aircraft flying over a landowner's property low enough and with sufficient frequency to have a direct and immediate effect on the use and enjoyment of the property. We remand the case to the circuit court to

make further factual findings and to hold additional hearings, as necessary, to determine whether a taking occurred in this case.

*By the Court.*—The decision of the court of appeals is affirmed.