In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-2213

SAUK PRAIRIE CONSERVATION ALLIANCE,

*Plaintiff-Appellant*,

*v.*

UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 17-cv-35 — **James D. Peterson**, *Chief Judge*.

ARGUED MAY 17, 2019 — DECIDED DECEMBER 12, 2019

Before RIPPLE, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The National Park Service donated more than 3,000 acres in central Wisconsin to the state's Department of Natural Resources. The goal was to turn the site of a Cold War munitions plant into a state park designed for a variety of recreational uses. That land now makes up the Sauk Prairie Recreation Area ("Sauk Prairie Park"). The Sauk Prairie Conservation Alliance ("the Alliance"), an environmentalist group, sued to halt three activities now

permitted at the park: dog training for hunting, off-road motorcycle riding, and helicopter drills conducted by the Wisconsin National Guard. The defendants include the Department of the Interior, the National Park Service, and several federal officers. The State of Wisconsin intervened.

The Alliance invokes two federal statutes. The first is the Property and Administrative Services Act ("the Property Act"), which, among other things, controls the terms of deeds issued through the Federal Land to Parks Program, 40 U.S.C. § 550, the program that led to the creation of Sauk Prairie Park. The statute requires the federal government to enforce the terms of any deed it issues. And here, the relevant deeds provide that Wisconsin must use Sauk Prairie Park for its originally intended purposes. The Alliance argues that dog training and motorcycle riding are inconsistent with the park's original purposes because neither was mentioned in Wisconsin's initial application. So, the argument goes, the statute requires the National Park Service to enforce the deeds by taking action to end those uses. The Property Act also requires, with some important qualifications, that any land conveyed through the program must be conveyed for recreational purposes. The Alliance argues that this provision precludes military helicopter training.

The second statute at issue is the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. The Alliance claims that the federal defendants violated NEPA by failing to prepare an environmental-impact statement prior to approving these three uses.

The district court entered summary judgment for the defendants on all claims, and we affirm. To start, the National Park Service's approval of these three uses did not violate the

Property Act. Dog training and off-road motorcycle riding were not explicitly mentioned in the State's initial application, but both are recreational uses and therefore consistent with the original purposes of Sauk Prairie Park. And while military helicopter training is obviously not recreational, the National Park Service included a provision in the final deed explicitly reserving the right to continue the flights, and the Property Act authorizes reservations of this kind.

As for the NEPA claim, the Alliance failed to show that the National Park Service acted in an arbitrary and capricious manner. The agency reasonably concluded that its approval of both dog training and off-road motorcycle riding fell within a categorical exclusion to NEPA's requirements—an exclusion for minor amendments to an existing plan. Helicopter training, on the other hand, likely doesn't fall within that category. Still, the National Park Service was not required to prepare an environmental-impact statement for this use because the agency had no authority to discontinue the flights. Because the Park Service had no discretion, it was not required to prepare an environmental-impact statement.

## I. Background

The former Badger Army Ammunition Plant was once the world's largest propellant-manufacturing facility. Years of heavy industrial use contaminated the area's soil and groundwater with asbestos, lead paint, PCBs, and oil. Plant operations ceased in 1975, and since then the Army's remediation efforts have yielded thousands of acres suitable for recreational use.

In 2001 the General Services Administration ("GSA") prepared an environmental-impact statement assessing various uses for the site. Given the property's proximity to other recreation areas, the GSA concluded that low- and medium-intensity recreational uses—activities ranging from hiking to snowmobiling—would be most appropriate. Around the same time, then-Congresswoman Tammy Baldwin and local officials formed the Badger Reuse Committee, which recommended uses for the property.

Three years later the Wisconsin Department of Natural Resources ("DNR") applied to acquire portions of the property through the Federal Land to Parks Program. *See* 40 U.S.C. § 550. As part of its application, the DNR prepared a Program of Utilization, a four-page document describing the proposal at a general level. It said that the area would be used for recreational purposes and that it would "include facilities for hiking, picnicking, primitive camping, Lake Wisconsin access and viewing, savanna and grassland restoration, environmental education, and cultural/historical interpretation." The Program of Utilization added that many local groups "shared a common goal" of converting the property into a recreation area that would include low-impact uses. But while the proposal said that the permitted activities would include these low-impact uses, it never said that the list was exhaustive. To the contrary, it explicitly stated that the DNR would prepare a more detailed "Master Plan" at a later date to "define appropriate land uses." Indeed, when the DNR wrote the Program of Utilization, it had no idea which parts of the future Sauk Prairie Park it would receive, so a detailed proposal simply wasn't possible. To give an example, the state agency did not yet know that it would receive Parcel V1, a heavily contaminated area

that for decades had been used by the Wisconsin National Guard for helicopter training.

In 2005 the National Park Service approved the application, stating that the DNR would convert the land primarily for recreational use, including the activities listed in the Program of Utilization. Over the next decade, the National Park Service began transferring the land piece by piece. Between May 2010 and February 2015, the agency executed six deeds conveying all but a few of the parcels that would eventually make up Sauk Prairie Park (we'll say more on the remaining parcels in a moment). Each of these six deeds included the following language:

> [T]he property shall be used and maintained exclusively for public park or public recreation[al] purposes for which it was conveyed in perpetuity … as set forth in the program of utilization … , which program and plan may be amended from time to time at the request of either the Grantor or Grantee.

In other words, each deed explicitly incorporated the DNR's Program of Utilization—subject to amendment—as a statement of the purposes for which the land was conveyed. The deeds also said that if the DNR violated this condition (or any others), the land "shall revert to and become the property of the [federal government] at its option."

During those same years, the DNR was developing its Master Plan for Sauk Prairie Park. It released a rough draft in late 2015 and a final draft a year later. Each version proposed to permit two of the activities contested here. The first is dog training. Under the Master Plan, hunters may use a

small area—roughly 2% of the park—to train their dogs; namely, they acclimate the dogs to gunshots, though the parties tell us that only blanks are used. (Relatedly, the Master Plan permits "dog trialing," a competitive event that also involves hunting dogs.) It's worth noting that the Alliance has chosen not to challenge any of the other ways in which parkgoers may bring dogs to and shoot guns in the park. For instance, no one is challenging the fact that hunting itself is permitted throughout the park during certain months of the year.

The second contested use is off-road motorcycle riding. Six days a year up to 100 riders may use a limited portion of the bike trails at Sauk Prairie Park. The motorcycles must meet several environmental standards, including a noise restriction.

As for helicopter training, the Master Plan was more tentative. By the time the DNR submitted its final draft, the National Park Service had executed the six deeds we've just mentioned, but it had not yet transferred Parcel V1 where the helicopters land. The Master Plan did say that the DNR would support the continued use of the land for "limited training exercises." But because helicopter training is not a recreational use, the Master Plan said that it would have to be phased out "unless the V1 deed includes specific language allowing future use by the [Wisconsin National Guard]."

The Master Plan also included the DNR's state-level environmental-impact statement. The DNR concluded that dog training and off-road motorcycle riding would not have a significant effect on the environment. Most of the state agency's analysis focused on the fact that the Master Plan as

a whole would improve the environment by converting a former munitions plant into a conservation-focused recreation area—in other words, that the positive effects would outweigh the negative. But the plan also included a meaningful explanation of why the DNR thought dog training and off-road motorcycle riding specifically would have a minimal impact, even when viewed in isolation. The DNR's assessment of helicopter training was less optimistic. The Master Plan noted that helicopters, if permitted, would generate substantial noise, wind, and dust, and that "[t]here is a lack of information about other potential impacts [on wildlife,] including reproduction, physiological stresses, and behavior patterns."

The National Park Service approved the final draft of the Master Plan and told the DNR that it would treat the document as an amendment to the Program of Utilization. The National Park Service did not, however, prepare its own environmental-impact statement before approving the plan. Instead, it prepared a short screening form in which it concluded that the changes to the Program of Utilization were categorically excluded from NEPA's requirements. According to the agency, an environmental-impact statement wasn't necessary for "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact." Relying almost entirely on the DNR's environmental analysis, the agency concluded that the changes to the Program of Utilization would have "only minimal" environmental impact.

After the Master Plan went into effect, the National Park Service executed two final deeds conveying what remained of the site. One included essentially the same terms as the

previous six: that the DNR must use the land in ways consistent with the purposes described in the Program of Utilization, subject to amendment, and that the federal government can reclaim the land if the DNR violates that condition.

But the final deed broke new ground. This instrument conveyed Parcel V1, the site of the helicopter exercises. Like the other seven, this deed incorporated the Program of Utilization to define the "purposes for which [the property] was conveyed." Unlike the other seven, it included a new provision:

> Notwithstanding [the paragraph incorporating the Program of Utilization], if requested by the WDNR or by the Governor of the State of Wisconsin, the Wisconsin National Guard may enter into an agreement with the WDNR to utilize Parcel V1 for rotary wing aviation training conducted in a manner that is consistent with [the] WDNR's approved Master Plan for the Property.

According to e-mails between GSA and the National Park Service, the United States Army imposed this requirement. After the parcel was transferred, the DNR and the Wisconsin National Guard entered into an agreement permitting continued helicopter training on Parcel V1. The agreement also specified a limited flight path for helicopters crossing the rest of Sauk Prairie Park to reach Parcel V1. Over certain areas the helicopters may fly as low as 25 feet above the ground, while in others they must clear 500 feet.

*     *     *

The Alliance is an environmental organization whose members use Sauk Prairie Park for recreational purposes. It sued the federal defendants, and the DNR later intervened. The Alliance claims that the National Park Service violated the Property Act by authorizing dog training and off-road motorcycle riding, uses that are inconsistent with the park's original purposes. The Alliance also claims that the agency violated the Act by approving helicopter training, a plainly nonrecreational use. Finally, the Alliance claims that the agency violated NEPA by failing to prepare an environmental-impact statement for these uses.

The Alliance moved for a preliminary injunction, which the district judge denied. While the Alliance's interlocutory appeal of that ruling was pending, the judge entered summary judgment for the defendants on all claims. The judge ruled that the contested uses do not conflict with the Property Act and that the amendments to the Master Plan do in fact fall within a categorical exclusion to NEPA's requirements. We now review that final judgment on the merits.

## II. Discussion

"We review a summary judgment de novo, asking whether the movant has shown that there is no genuine dispute as to any material fact." *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1102 (7th Cir. 2019) (quotation marks omitted). Under the Administrative Procedure Act, which controls our review, we may set aside the agency's decisions only if they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This "standard of review is a narrow one." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quotation marks omitted). "We only must ask whether the deci-

sion was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952–53 (7th Cir. 2003) (quotation marks omitted). Regarding the NEPA claim in particular, "arbitrary and capricious review prohibits a court from substituting its judgment for that of the agency as to the environmental consequences of its actions." *Id.* at 953 (quotation marks and alteration omitted).

Before we take up the merits, a brief word about standing. The district judge appropriately began his analysis by examining whether the Alliance has standing to challenge the contested uses. Citing well-established principles governing suits brought by environmental groups, the judge concluded that the Alliance has established standing to sue. More specifically, the judge evaluated the following requirements for associational standing:

> An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit.

*Sierra Club v. Franklin Cty. Power of Ill., LLC*, 546 F.3d 918, 924 (7th Cir. 2008). The judge concluded that the Alliance satisfies each of these elements, and we agree. No one contests the point, so no more needs to be said.

### A. The National Park Service's approval of the contested uses was fully consistent with the Property Act.

We start with an overview of the statutory framework. Four aspects of the Property Act are important here:

*First*, the statute authorizes the Secretary of the Interior (the "Secretary") to sell surplus land to states to build parks. "[T]he Secretary, for public park or recreation area use, may sell or lease property assigned to the Secretary … to a State, a political subdivision or instrumentality of a State, or a municipality." 40 U.S.C. § 550(e)(2).

*Second*, the statute mandates that whenever the Secretary executes a deed, the government must retain the option to retake the land if the state stops using the property for its intended purposes.

> The deed of conveyance of any surplus real property disposed of under this subsection … shall provide that all of the property be used and maintained for the purpose for which it was conveyed in perpetuity, and that if the property ceases to be used or maintained for that purpose, all or any portion of the property shall, in its then existing condition, at the option of the Government, revert to the Government.

§ 550(e)(4)(A).

*Third*, the statute authorizes the Secretary to include other necessary reservations in addition to the option to retake the land. "The deed of conveyance of any surplus real property disposed of under this subsection … may contain additional terms, reservations, restrictions, and conditions

the Secretary of the Interior determines are necessary to safeguard the interests of the Government." § 550(e)(4)(B).

*Fourth*, the statute imposes an affirmative obligation on the Secretary to enforce the terms of the deeds. The Secretary "shall determine and enforce compliance with the terms, conditions, reservations, and restrictions contained in an instrument by which a transfer under this section is made." § 550(b)(1).

### 1. *Dog Training and Off-Road Motorcycle Riding*

No one disputes that both dog training and off-road motorcycle riding are recreational activities. The Alliance argues that the National Park Service nonetheless violated the Property Act when it approved these uses because (1) the federal government has an obligation under § 550(b)(1) to enforce the terms of the deeds; (2) the deeds say, in accordance with § 550(e)(4)(A), that the property may be used only for its originally intended purposes; and (3) these two activities were not among the originally contemplated uses.

This argument turns on how the park's originally intended purposes are defined. For what it's worth, we agree with the Alliance that we begin with the Program of Utilization. All eight deeds explicitly incorporate that document as a statement of the "public park or public recreation purposes for which [the property] was conveyed in perpetuity." But the Alliance fails to appreciate the broad strokes with which the Program of Utilization discussed the park's purpose. The document is written at a high level of generality. It simply says that Sauk Prairie Park will be used for recreation with the specifics to be filled in later by the Master Plan. And that's exactly what happened here.

The Alliance insists that the Program of Utilization limits the park's uses to the specific activities listed—things like hiking and camping—or at the very least to low-impact uses. But that's not what the Program of Utilization says. It says only that the proposed uses will *include* those listed. And we generally read the word "including" to "introduce[] examples, not an exhaustive list." *Bernal v. NRA Grp., LLC*, 930 F.3d 891, 894 (7th Cir. 2019) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 132 (2012)).

So we frame the purpose of the conveyance at an appropriately general level: the property was conveyed for recreational use, writ large. And dog training and off-road motorcycle riding are fully consistent with that broad recreational purpose. When the Master Plan filled in the details by adding these uses (among others), it did no more than implement what was laid out in the Program of Utilization. So there was no deed violation—and therefore nothing for the National Park Service to enforce.

The Alliance offers two responses. First, it says that the DNR was bound not just by the Program of Utilization but also by the recommendations of the Badger Reuse Committee, the group of local officials organized early in the process. The Alliance maintains that the committee recommended only low-impact uses. But it has never explained why those recommendations are binding. Granted, the Program of Utilization says that the Master Plan would "build upon work done" by the committee. But it never said that the Master Plan's authors were bound to what the committee had in mind. As far as we can gather from the

record, the committee's recommendations were exactly that: recommendations.

Second, the Alliance argues that the DNR was authorized to add new activities only if the additions were similar to the activities that were already listed—namely, those with similarly minimal environmental impact. The Alliance frames this argument as a variation on the *ejusdem generis* canon of interpretation. *See* SCALIA & GARNER, *supra* at 199 ("Where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."). Once again, nothing in the Program of Utilization called for that kind of rigidity. The document included a nonexhaustive list of examples with a separate provision explaining that the list would be expanded. Indeed, the most the document says is that the listed activities were "the types of uses we'd antici-pate would come out of the planning process." Nothing in that language outright prohibited the DNR from exploring other recreational uses.[1]

---

[1] As for *ejusdem generis*, there are several reasons the canon doesn't apply. For one, we typically use it "to ensure that a general word will not render specific words meaningless," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 295 (2011), and there's no risk of that here. To the contrary, it's obvious why this document would include some specifics in addition to a general reservation for amendments: It was an early proposal for a large-scale plan, so it would be natural to give as many details as possible while otherwise retaining flexibility. So the canon just doesn't do any work here—for this reason, and others. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (explaining that the canon is relevant only when the text follows an exact pattern: where there is "a list of specific items separated by commas and followed by a general or collective term"); *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351, 354

Simply put, nothing in the text of the document suggests a restriction on the DNR's ability to add new recreational uses. The National Park Service did not violate the Property Act when it approved dog training and off-road motorcycle riding at Sauk Prairie Park.[2]

**2.** *The National Guard's Helicopter Exercises*

Unlike dog training and off-road motorcycle riding, military helicopter training is legitimately inconsistent with the recreational uses laid out in the Program of Utilization. No one argues otherwise. But the National Park Service included a provision in the deed conveying Parcel V1 that explicitly permits the DNR to reach an agreement with the Wisconsin National Guard to authorize continued helicopter training. This counts as an "additional … reservation[] … necessary to safeguard the interests of the Government" as permitted under § 550(e)(4)(B).

In response the Alliance argues that § 550(e)(4)(B) is still subject to the statute's overarching requirement that the property be conveyed for recreational use. That is, the Alliance contends that the "additional reservations" can include whatever reservations the government finds are in

---

(7th Cir. 2006) (explaining that the canon applies only if "uncertainty or ambiguity exists").

[2] The Alliance also raises a technical challenge to a provision in the Master Plan permitting the DNR to hold unspecified special events outside the park's normal use patterns. But the Alliance offered almost no independent analysis of why that provision violates the Property Act. In any event, the special events will be recreational in nature, so they—like dog training and off-road motorcycling—are perfectly consistent with the purposes for which Sauk Prairie Park was conveyed.

its interests *unless* those reservations would permit non-recreational activity.

We disagree with this interpretation of the Property Act. It is perfectly consistent with the statute for the federal government to convey its property to the State of Wisconsin "for public park or recreation area use," § 550(e)(2), and to require that "the property be used and maintained" by the State in perpetuity for recreational use, § 550(e)(4)(A), while simultaneously including "reservations" in its own interests that have nothing to do with recreation. The Alliance counters that the statute puts the government to an all-or-nothing choice: abandon all nonrecreational interests in the property or don't use the § 550(e) land-grant program at all. But that ultimatum simply isn't in the statute's text. The statute instead broadly permits reservations—i.e., "[t]he establishment of a limiting condition or qualification." *Reservation*, BLACK'S LAW DICTIONARY (11th ed. 2019); *id.* ("A keeping back or withholding."). That is, while § 550(e)(2) authorizes the government to sell or donate the property for recreational use, § 550(e)(4)(B) authorizes the government to limit and qualify that transfer. The fact that the *transfer* must be for a given reason doesn't mean that the *limitations* on that transfer must advance the same purpose. If they did, they wouldn't even *be* limitations.

After all, it's hard to imagine a reservation aimed exclusively at recreation that would be "necessary to safeguard the interests" of the United States Government. § 550(e)(4)(B). Indeed, the Alliance's argument would invalidate most of the other reservations found in these deeds, none of which it contends were unlawful. For example, the deeds retain for the federal government "a non-exclusive

easement for use of … roadways," presumably for nonrecreational purposes. The deeds also grant the government the right "to enter upon the Property *for any purpose* of its own as long as [the] Army continues to occupy any portion of the former" munitions plant. (Emphasis added.) And the deeds grant the Army "the right to excavate and remove clay from any portion of the Property." If the Alliance's interpretation is correct, all of these unchallenged reservations would also violate the Property Act because they all permit nonrecreational uses. But the Alliance's interpretation is not correct; the clear terms of § 550(e)(4)(B) permit the government to include exactly these kinds of qualifications.

Next, the Alliance says that the helicopter-training provision is unlawful because it conflicts with other parts of the deed that require the property to be used for recreational purposes consistent with the Program of Utilization. But the paragraph of the deed authorizing helicopter training explicitly says that it applies "notwithstanding" the parts of the deed that discuss recreational uses. Because of that superordinating language, there is no conflict.

Finally, the Alliance says that § 550(e)(4)(B) should not apply because there is no evidence that the Secretary actually determined that this reservation is "necessary to safeguard the interests of the Government." This argument is new on appeal; the Alliance never mentioned it in the district court. When we raised the prospect of waiver at oral argument, the Alliance's attorney directed us to two pages of its summary-judgment brief. But those pages never mention this point, nor does anything in the rest of the brief. The argument is therefore waived. *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("It is a well-established rule

that arguments not raised to the district court are waived on appeal.").

Even if the Alliance had preserved this argument, the available evidence suggests that the Secretary included this reservation because the Department concluded, in light of a request by the Army, that the provision was necessary to safeguard the nation's interests in training members of the National Guard. In one e-mail, a GSA representative explained to Elyse LaForest of the National Park Service that the helicopter provision was "a requirement imposed by [the] Army to allow continued use of the parcel by [the] Wisconsin National Guard for helicopter training activities." In a second e-mail, LaForest explained to the DNR that "helicopter use is a condition of assignment by the Army." And in a third e-mail chain, LaForest informed the State that the provision was originally requested by the Pentagon and that the National Park Service did not have the authority to move forward until it got "word from [the] Army." So waiver aside, the Alliance's argument is meritless.

As a fallback the Alliance argues that even if helicopter training in Parcel V1 is not unlawful, the low-level flights over the rest of the park are a step too far. As the Alliance correctly notes, the deeds conveying the other parcels said nothing about helicopters. They simply said that the "property shall be used and maintained exclusively for public park or public recreation[al] purposes … in perpetuity." The federal defendants argue that the other deeds are relevant only in defining which *land* uses are permitted and that the military has the right to use the airspace over those parcels regardless of whether the deeds explicitly permit it.

We're hard-pressed to evaluate this argument because no party cites any support for its position—not a single case, statute, or regulation. The Alliance simply declares that the flights violate the deeds; the federal defendants declare that they do not. But this isn't an easy question with an obvious answer. We've identified a number of legal principles that could plausibly be relevant. For instance, a Wisconsin statute declares that "[t]he ownership of the space above the lands and waters of this state is declared to be vested in the several owners of the surface beneath." WIS. STAT. § 114.03. Likewise, the Wisconsin Supreme Court has said that "a landowner has a three dimensional property interest in … the block of air that is bounded by … the person's land holdings … and rises up to approximately the height of the government-defined minimum safe altitude of flight." *Brenner v. New Richmond Reg'l Airport Comm'n*, 816 N.W.2d 291, 303 (Wis. 2012). And the state high court has also held that the government takes a property interest in a piece of land if it flies "low enough and with sufficient frequency to have a direct and immediate effect on the use and enjoyment of the property." *Id.* at 310. On the other hand, while federal regulations prohibit aircraft from flying below certain altitudes, *see* 14 C.F.R. § 91.119, they carve out an exception for helicopters, which "may be operated at less than the minimums prescribed" elsewhere so long as the pilot follows federal law and flies "without hazard to persons or property on the surface," *id.* § 91.119(d).

Without the benefit of any briefing on these issues, we have no basis to properly evaluate this argument. Because the Alliance did not develop its position in a meaningful way, this argument is also waived. *See Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 495 F.3d 779, 783 (7th

Cir. 2007) ("A party waives any argument that it does not raise before the district court or, if raised in the district court, it fails to develop on appeal.") (quotation marks omitted).

## B. The National Park Service's NEPA analysis was not arbitrary or capricious.

NEPA requires federal agencies to prepare environmental-impact statements for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). The federal defendants argue that the National Park Service was not required to prepare an impact statement evaluating dog training or off-road motorcycling because the agency's approval of these uses was categorically excluded from NEPA's requirements. As for helicopter training, they argue that the National Park Service had no discretion to discontinue the flights in light of the Army's demands.

### 1. *Dog Training and Off-Road Motorcycle Riding*

Whether an environmental-impact statement is required hinges on whether the action at issue will "significantly affect" the environment. The question here is how much analysis an agency must do before deciding that an action won't have significant environmental effects. More specifically, how can an agency know what effects the action will have without preparing the environmental-impact statement in the first place?

In the typical case, an agency will prepare an "environmental assessment," *see* 40 C.F.R. § 1501.4(b), which we've described as "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and

time-consuming to prepare and has been the kiss of death to many a federal project—is necessary," *Rhodes v. Johnson*, 153 F.3d 785, 788 (7th Cir. 1998) (quotation marks omitted). But an agency can skip the environmental assessment if an action falls within a "categorical exclusion," *see* 40 C.F.R. § 1501.4(a)(2), which the regulations define as "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency," *id.* § 1508.4. If an action falls within a categorical exclusion, the agency generally does not need to prepare an environmental-impact statement, subject to one carveout: Even if an action falls within a specified category, an environmental-impact statement is still necessary if there are "extraordinary circumstances" indicating that the action will nonetheless have a significant effect. *See id.* So the inquiry presents two questions: Does this action fall within a category that generally has no significant effect? And will it nonetheless have a significant effect because of extraordinary circumstances unique to this case?

The National Park Service prepared neither an environmental-impact statement nor an environmental assessment. Instead it took the position that the decision to permit the contested uses fell within a categorical exclusion for "[c]hanges or amendments to an approved plan, when such changes would cause no or only minimal environmental impact." We'll call this the minor-amendment category.

We begin by noting that the Alliance has never challenged whether the minor-amendment category is legitimate in the first place—despite several potential problems with its provenance. For one, the substance of this category of exclu-

sion is rather unusual. As mentioned, section 1508.4 permits an agency to skip an environmental-impact statement for actions falling within a specified category, but only if it uses established procedures to determine that actions within that category generally have no significant effect. In other words, NEPA always requires some sort of environmental analysis, but the agency may do it at the categorical level rather than on a case-by-case basis. But the minor-amendment category is *defined* in terms of whether an action's impact will be minimal, which is completely circular: Why doesn't the agency have to assess whether the action will have a significant effect? Because it falls within the minor-amendment category. Why does it fall within that category? Because it won't have a significant effect. Given that circularity, it's unclear what kind of environmental analysis the National Park Service could have possibly done at a categorical level.[3]

---

[3] There was also some uncertainty at oral argument about whether this category was developed through notice-and-comment rulemaking and whether it appears in the Federal Register—both of which are indisputably required. *See* 40 C.F.R. §§ 1508.4, 1507.3. But after oral argument the government was finally able to confirm that the minor-amendment category went through the rulemaking process and that it appears in the federal register. *See* National Environmental Policy Act; Revised Implementing Procedures, 49 Fed. Reg. 39,233, 39,235 (Oct. 4, 1984).

Likewise, there was some uncertainty about whether the minor-amendment category appeared anywhere in the record on appeal. In the National Park Service's NEPA screening form—the document in which it determined that no environmental-impact statement was needed—the agency claimed that the minor-amendment category could be found in section 3.3(B)(1) of the agency's NEPA handbook. But the parties could not identify at oral argument where section 3.3(B)(1) appeared in the record. The agency's appendix includes only section 3.3(A)(1)—a similarly worded category that applies to changes to "actions related to

Nonetheless, the Alliance did not raise this point in its briefs, and at oral argument it affirmatively waived any challenge to the substance of the minor-amendment category. For the purpose of this litigation, no environmental-impact statement was required if the National Park Service found that the amendments to the Program of Utilization "would cause no or only minimal environmental impact."

The first major dispute is whether it was appropriate for the National Park Service to rely almost exclusively on the DNR's environmental-impact statement. The National Park Service itself prepared only a short 13-page screening form in which it checked a few boxes and included a few lines of brisk explanation. Its final conclusions rested almost entirely on conclusions already made by the state environmental agency. The Alliance claims that the National Park Service was required to conduct its own independent analysis to satisfy NEPA.

We disagree. To be sure, there are several places where either NEPA or its associated regulations require independent actions by the federal agency itself. For instance, when a full environmental-impact statement is necessary, the statute requires "a detailed statement *by the responsible official*." § 4332(C) (emphasis added). Likewise, an agency can approve a category of use as a categorical exclusion only if the category first passes through procedures established "*by a Federal agency*." *See* 40 C.F.R. § 1508.4 (emphasis added). But the Alliance hasn't cited any legal authority that limits what

---

general administration." But the agency indisputably did not rely on that category here. It wasn't until after oral argument that the government finally supplemented the record with the correct portion of its NEPA handbook.

kind of information an agency may rely on in determining whether a properly promulgated category applies. And that's the kind of choice that's usually left to the agency. *See La. ex rel. Guste v. Verity*, 853 F.2d 322, 329 (5th Cir. 1988) ("[O]ur deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology.").

We dealt with a similar question in a different context in *Highway J Citizens Group.* The question there was whether a federal agency could rely on a state-level environmental analysis—not at the first step of the categorical-exclusion analysis (whether a categorical exclusion applies at all) but at the second step (whether extraordinary circumstances require an impact statement despite the category's application). We said that the federal agency could rely on the state's analysis because "neither a statute nor a rule requires the agency to write its own analysis." *Highway J Citizens Grp.*, 891 F.3d at 699. That is just as true at the first step of the categorical-exclusion analysis: No statute or rule requires an independent evaluation. Accordingly, a federal agency may rely on a state's environmental-impact analysis to determine whether a categorical exclusion applies.

The next major dispute concerns the appropriate baseline. An action with "minimal" impact falls within the exclusion. But "minimal" compared to what? The Alliance insists that because the minor-amendment category is defined in terms of "amendments," we should compare the impact of these three uses to "the impacts that would occur under the original Program of Utilization." The National Park Service disagrees. Rather than compare the amended plan to what *would have happened* under the original pro-

posal, the National Park Service says that we should focus on the final plan's impact on the park's actual, current conditions.

According to the Alliance, the National Park Service's baseline distorts the inquiry in two ways. First, it absolves the agency of doing meaningful analysis because pretty much any plan would improve the park's current conditions. Sauk Prairie Park sits on the remains of a contaminated munitions plant, so *any* kind of recreation area will be an improvement. Second, the Alliance argues that the National Park Service's baseline allows for too much balancing of distinct impacts. Namely, the federal agency claims it can offset the negative impacts of these uses with the positive impacts of the plan's extensive habitat-restoration efforts. The problem, according to the Alliance, is that we're evaluating proposed changes to the Program of Utilization, and the original program already included those restoration efforts. The Alliance also argues that federal regulations prohibit this kind of offsetting. *See* 40 C.F.R. § 1508.27(b)(1) ("A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.").

We need not decide which baseline is correct. Under either framework there was enough analysis in the Master Plan and in the NEPA screening form to support the National Park Service's conclusion that the amendments would have minimal impact. In other words, some of the analysis truly does evaluate the effect of the amendments *as amendments*, just as the Alliance demands.

As discussed, the National Park Service's NEPA screening form relied heavily on the environmental analysis that the DNR provided in the Master Plan. It's important to

remember that when the state agency prepared its own environmental-impact statement, it was evaluating the plan in its entirety. As a result, it includes analysis of both the total result—that is, the cumulative effect of the beneficial and harmful impacts—as well as of individual uses on their own.

To give just a few examples, the Master Plan describes nine ways in which it proposed to limit the harmful effects of off-road motorcycling. Among others, riding would be limited to six days per year and to half the park's trails, and each bike would have to be tested to ensure its noise did not exceed 96 decibels. The Master Plan then explained that at Wisconsin's Bong State Recreation Area, data showed that "[t]here doesn't appear to be a sizeable reduction in the number of species or number of birds in the area where motorized recreation is allowed compared to other areas on the property." Finally, the Master Plan concluded, "[w]hile individual animals may experience stress and stress responses[,] … any impacts to populations are expected to be minor." Largely relying on these findings, the National Park Service noted in its NEPA screening form that because the "plan has limited the frequency of motorized use and provides management guidelines to limit impacts on wildlife," the use would not "[h]ave significant negative impacts on species."

Note that this analysis explicitly compares what would happen with motorcycle riding to what would happen without it. In other words, it compares the effect of a plan with amendments to the effect of a plan with none. That's the Alliance's baseline.

The analysis of dog training was less extensive, but the Master Plan still assessed its impact under the Alliance's proposed baseline, at least to some extent. For instance, the plan says that "[a]ny impacts to biological resources from dog trials are likely to be minimal, localized, and of short duration." It also says that because there is no "pattern of problems or complaints related to the use of dog training grounds" at other recreation areas in the state, "[a]ny impacts associated with the dog training at [Sauk Prairie Park] are expected to be minor and temporary."

Granted, the Master Plan also included language about the impact of the plan as a whole rather than of the amendments in isolation. For instance, it said, "When balanced against the habitat improvements that are planned and associated increases in wildlife that are expected, impacts from the use of dual-sport motorcycle[s] at [Sauk Prairie Park] are expected to be limited." But the fact that the Master Plan included some "whole plan" analysis doesn't change the fact that it also included ample analysis directly assessing the impact of the amendments themselves.

That analysis was sufficient—certainly so under our narrow standard of review. As noted earlier, we may set aside the agency's decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has directed us to ask whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), but "the ultimate standard of review is a narrow one," *Marsh*, 490 U.S. at 378 (quotation marks omitted). In the

NEPA context, we have said that "[i]f an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Highway J Citizens Grp.*, 349 F.3d at 953. The agency relied on the State's analysis, which in turn evaluated the expected impact of the contested uses and concluded that the impact would be minimal—even when considered in isolation, without reference to other beneficial parts of the plan. Nothing about the agency's conclusion was arbitrary or capricious, and its application of expertise is entitled to deference.

As a final rejoinder, the Alliance falls back on the second step of the categorical-exclusion analysis. It argues that even if this use falls within the categorical exclusion, the National Park Service was still required to prepare an environmental-impact statement because of extraordinary circumstances. As required by federal regulations, the Department of the Interior has promulgated a list of potentially extraordinary circumstances that should be considered in this context. *See* 43 C.F.R. § 46.215. The Alliance claims four are at issue here.

The first three involve issues similar to those we've already discussed. The Alliance argues that the action will have "significant impacts on such natural resources and unique geographic characteristics as … park, recreation, or refuge lands[,] … and other ecologically significant or critical areas." *Id.* § 46.215(b). It then argues that the action will have "highly uncertain and potentially significant environmental effects." *Id.* § 46.215(d). And finally, it argues that the action will "[e]stablish a precedent for future action … with potentially significant environmental effects." *Id.* § 46.215(e). But

we've already held that the National Park Service adequately explained why dog training and motorcycle riding will not have significant environmental effects. These arguments fail for the same reasons.

The fourth provision is slightly more plausible. The Alliance claims that the action will have "highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources." *Id.* § 46.215(c). The National Park Service acknowledged in its NEPA screening form that there was public controversy over whether to permit active or passive recreation. The agency discounted that problem by noting that the State—not the federal government—defines the property's uses. But it's not clear why that matters: The National Park Service concedes that its decision to *approve* the State's proposed uses is a major federal action for NEPA purposes. So it has an obligation to determine whether its own extraordinary-circumstances regulations require an impact statement. And those regulations say that "highly controversial environmental effects or … unresolved conflicts" can be enough to trigger further review. Nonetheless, the Alliance never argued before the district court that public controversy warranted a full impact statement under this regulation. The argument is therefore waived. *See Puffer*, 675 F.3d at 718.

The National Park Service's approval of dog training and off-road motorcycling fits comfortably within the categorical exclusion, and no extraordinary circumstances otherwise required a full environmental-impact statement.

**2.** *Helicopter Training*

In its NEPA screening form, the National Park Service offered essentially no independent analysis of the environmental impact of helicopter training at Sauk Prairie Park. And unlike with the other two contested uses, the agency didn't even purport to rely on the state-level environmental-impact statement. That was likely because the DNR couldn't say with certainty that continued helicopter training would not harm the environment. It noted that helicopters "will generate considerable wind and dust" and "substantial noise," and that "[t]here is a lack of information about other potential impacts [on wildlife,] including reproduction, physiological stresses, and behavior patterns."

All the same, the federal defendants argue that no impact statement was required because NEPA applies only when an agency has discretion over whether to take the proposed action. The National Park Service had no discretion here because the Army conditioned its approval of this land transfer on continued helicopter use. It was the Army's land to begin with, and the Army would not release it without this provision. In other words, helicopter training was going to continue at Parcel V1 one way or another.

Earlier in this opinion we addressed a similar issue when we discussed whether the Secretary actually determined that the helicopter-training provision was necessary to safeguard the nation's interests as required by § 550(e)(4)(B). As we observed, the available evidence shows that the Secretary included this provision in the final deed based on the Army's request. Communications between different government agencies reveal that continued helicopter use was "a requirement imposed by [the] Army," that "helicopter

use is a condition of assignment by the Army," and that the National Park Service did not have the authority to move forward until it got "word from [the] Army" on this issue.

Given that the National Park Service had no independent authority to end helicopter training at Parcel V1, no environmental-impact statement was required. The Supreme Court addressed this question in *Department of Transportation v. Public Citizen*, 541 U.S. 752, 766 (2004). That case involved the regulation of motor carriers (i.e., highway trucks); more specifically, it dealt with the authorization of Mexican motor carriers to operate in the United States. The statutory and regulatory background is somewhat complex, but the central question was whether an agency had to evaluate the environmental effects of opening the United States market to Mexican motor carriers if the agency had no authority to categorically exclude applications from that country.

The Court held that the agency was not required to conduct any analysis. The decision started with causation principles. NEPA requires an environmental-impact statement only when a federal action will "significantly affect" the environment, § 4332(C), and federal regulations define "effects" as something "caused by the action" the federal agency is contemplating, 40 C.F.R. § 1508.8; *see Public Citizen*, 541 U.S. at 763–64. The Court held that an action must be both the "but for" cause of the environmental impact as well as the proximate cause. *See Public Citizen*, 541 U.S. at 767. In *Public Citizen* there was an insufficient causal connection between the agency's proposed regulations and the environmental effect of new applications because the agency had no authority to prohibit those applications. *See id.* at 768–70.

This case is exactly the same. The National Park Service could either approve the provision that permitted helicopter training in the recreation area or it could permit the Army to retain the land and continue the helicopter training all the same. Because the National Park Service had no authority to end the helicopter training, there is no causal connection between its decision to approve the provision and any environmental effects continued training might have. Accordingly, the National Park Service was not required to prepare an environmental-impact statement.[4]

### III. Conclusion

In sum, the National Park Service did not violate the Property Act when it approved the three contested uses. Two of the three uses are recreational activities perfectly consistent with Sauk Prairie Park's recreational purposes, and the third was authorized by an explicit reservation in the deed, as permitted by statute. Nor did the National Park Service violate NEPA. It provided enough explanation for why two of the contested uses fell within a categorical

---

[4] The Alliance also briefly argues that the National Park Service should have prepared an environmental-impact statement evaluating the provision of the Master Plan permitting unspecified special events. But because these are unplanned events outside the park's normal use patterns, the Master Plan says that each permit applicant must show that the event will not unduly impact the park's resources. Today those events are merely hypothetical, so no impact statement is needed: "[NEPA] speaks solely in terms of *proposed* actions; it does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010) (quotation marks omitted).

exclusion. And because it had no authority to discontinue the third use, no environmental analysis was required.

AFFIRMED